# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

BRIAN W SWETLIK,

      Plaintiff,

  v.                                                              Case No. 09-C-1157

KEVIN CRAWFORD, Former Mayor, individually and
in his official capacity, JUSTIN NICKELS, Mayor and Former
Alderperson, individually and in his official capacity,
LEE THENNES Former Alderperson, individually and in
his official capacity, CHRISTOPHER ABLE, Alderperson,
individually and in his official capacity, RAYMOND GEIGEL
Alderperson, individually and in his official capacity,
ERIC SITKIEWITZ, Alderperson, individually and in his
official capacity, RICK SIERACKI, Former Alderperson,
individually and in his official capacity, DEAN GRAUNKE,
Alderperson, individually and in his official capacity,
THOMAS FRIEDER, Former Alderperson, individually and
in his official capacity, CITY OF MANITOWOC,
BRADLEY C FULTON, and MINDY ROWLAND,

      Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Brian Swetlik, a Detective Sergeant with the City of Manitowoc Police Department, claims that the Mayor and members of the Common Council for the City violated his constitutional rights by voting to institute termination proceedings against him before the Police and Fire Commission (PFC). Detective Swetlik was charged with repeatedly lying about the Chief of the Department, but the charges were dismissed after a two-day hearing. Detective Swetlik then brought this action under 42 U.S.C. § 1983, claiming that the City officials issued the charges

against him in retaliation for his constitutionally protected speech. The case is before me now on the defendants' motion for summary judgment. (ECF No. 34.) For the reasons discussed herein, the defendants' motion will be granted.

**I. Background**

The background facts to this case are lengthy and convoluted as laid out in Plaintiff's and Defendants' Proposed Facts. (ECF Nos. 36, 40.) What follows here is a brief synopsis of those facts, stripped of counsel's argumentative responses and unfounded objections. As noted above, Plaintiff Swetlik is an employee of the Manitowoc Police Department and at all material times hereto, has held the position of Detective Sergeant. Swetlik belongs to the Manitowoc Professional Police Union Local 20 (the Union). (Compl. ¶ 1.)

On November 12, 2005, Det. Swetlik was involved in the arrest and interview of a suspect in a stabbing. At the conclusion of the interview, Det. Swetlik transported the suspect from the Manitowoc Police Department to the Manitowoc County Jail for booking. (*Id.* ¶ 12.) While at the jail, Swetlik had a somewhat bizarre phone conversation with Manitowoc Police Chief Perry Kingsbury. For reasons that are not clear from the record, Chief Kingsbury was attempting to procure for the suspect a home-cooked meal from the suspect's mother before he was transferred to the jail. After the phone conversation, Swetlik repeatedly claimed Chief Kingsbury told him to lie to Manitowoc County jailers when they were processing the suspect and then threatened him when he failed to comply with the Chief's order. Specifically, Swetlik indicated that Chief Kingsbury had told him to tell the jailers that they had further questions for the suspect so that the suspect could be returned to the police department for the meal his mother was preparing. When

2

Case 1:09-cv-01157-WCG   Filed 06/27/12   Page 2 of 18   Document 54

Swetlik did not do so, he claimed that Chief Kingsbury told him "I'll deal with you later." (Def.s' Prop. Findings of Fact "DPFOF", ECF No. 36, ¶¶ 20, 22, 23, 26, 32.)

The actual words of Chief Kingsbury, which Detective Swetlik was characterizing, were recorded and later transcribed. (*Id.* ¶ 18.) A fair reading of the transcript is that the Chief wanted Detective Swetlik to tell the suspect, who was apparently suicidal and distraught, that they were going to bring him back to the station because they had more questions to ask, and then when he arrived, they would offer him the meal his mother had prepared. Instead, Detective Swetlik asked the suspect if he wanted to go back to the station for some food his mother cooked. The suspect responded "no, I ain't eating nothing," thereby ending the matter. Obviously perturbed that Detective Swetlik had not handled the situation as he instructed him, Chief Kingsbury responded:

> So you didn't do what I asked you to do. You started talking about the food. What I asked you to do is say, hey, you mind coming back over and ask a few questions, we forgot about something. And that's okay, you went about it your way, but - and now he doesn't want anything so just let him get booked -

(*Id.* ¶ 18.) The conversation between Chief Kingsbury and Detective Swetlik then continued:

| | |
|---|---|
| Det. Swetlik: | Well – |
| Chief Kingsbury: | Just let him get booked and whatever – whatever happens, happens. Okay? |
| Det. Swetlik: | Okay. He'll - he'll - he'll visit with her later, he just – |
| Chief Kingsbury: | Whatever. |
| Det. Swetlik: | - he don't - he don't want to eat anything. |
| Chief Kingsbury: | Well, I understand that, but we - we - we might have been able to get him a meal, okay. But that's okay, we might not have been. |
| Det. Swetlik: | Okay. |

3

Case 1:09-cv-01157-WCG    Filed 06/27/12    Page 3 of 18    Document 54

> Chief Kingsbury: We'll catch ya later.
>
> Det. Swetlik: Okay. Bye

(*Id.*) It is this innocuous telephone conversation that lies at the center of the massive expenditure of time and money that this case represents.

As soon as he hung up the phone, Det. Swetlik told those present, including another detective, a deputy sheriff and a jailer, that the Chief had told him to lie to the jailers and had threatened him for failing to do so. (*Id.* ¶ 20.) He repeated his accusations against the Chief later that same day to the Deputy Police Chief pursuant to the internal rules of the Department. (*Id.* ¶¶ 21, 22.) Over the following months, he repeated his accusations to other members of the Department as well. (*Id.* ¶¶ 26–28.)

On April 6, 2006, Det. Swetlik sent an email to Chief Kingsbury alleging he was being harassed. In response, the City Attorney retained outside counsel to conduct an investigation into Det. Swetlik's claims. Among the thirteen claims investigated by the attorney was Swetlik's claim that Chief Kingsbury had instructed him to lie to the Manitowoc County jailers and threatened him when he refused to do so. The attorney issued a thirteen-page report finding no evidence that Det. Swetlik was mistreated or harassed. (*Id.* ¶¶ 29–33.)

Det. Swetlik was not the only member of the Manitowoc Police Department upset with Chief Kingsbury. Sometime in late 2005 or early 2006, the Union, which represented the patrol officers and sergeants in the Department, reached the conclusion that the Chief should be replaced. In January of 2006, the Union voted no confidence in the Chief by a count of 49 to 1, with three abstaining. (Pl's Resp. to DPFOF, ECF. 42, ¶ 36.) In furtherance of its efforts to remove Chief Kingsbury, the Union compiled a "list of concerns." Among the 23 "concerns" listed by the Union,

which later grew to 37, was the accusation that the Chief "told officers to lie to other agencies." (DPFOF, ECF No.36, ¶ 43.) The Union then set forth Det. Swetlik's account of his November 15, 2005, telephone conversation with Chief Kingsbury accusing the Chief of instructing him to lie to the jailers and threatening to deal with him later when he refused. (*Id.* ¶¶ 37, 38.) On May 15, 2006, the Union, including Swetlik, marched *en masse* to City Hall to speak to the Manitowoc Common Council and express its concerns about public safety and the morale at the Police Department. The list of concerns was revised several times over the months that followed and sent to members of the Police and Fire Commission, the Common Council, the mayor, and a Wisconsin Employment Relations Commission (WERC) labor mediator. (*Id.* ¶¶ 40–42.)

On July 26, 2006, Chief Kingsbury sent a letter to Mayor Crawford requesting an investigation into the Union complaints against him and the Department. (*Id.* ¶ 47.) In response to the Chief's request, Mayor Crawford directed the City Attorney to institute immediately an investigation "using all necessary resources into the alleged complaint and accusations against the police chief and his administration, and all related issues and incidents." (*Id.* ¶ 48.) The City Attorney notified the Common Council of his intent to retain a third party investigator and advised the members to keep confidential and avoid any discussion of the allegations against the Chief so as to avoid any possible prejudice in the event the investigation gave rise to disciplinary actions against the Chief or other members of the Department. (*Id.* ¶ 50.)

The City Attorney thereafter retained the Madison law firm of DeWitt, Ross, & Stevens, S.C. to investigate the complaints. (Wirth Aff./Attach. Partial 3/21/11 Fulton Dep., ECF No. 35-14 at 8, 16.) Two attorneys from the firm, Bradley Fulton and Mindy Rowland-Buenger, conducted the investigation. (Wirth Aff./Attach Partial 11/16/11 Rowland Dep., ECF No. 35-15 at 7.) The

5

investigators conducted over 80 interviews under oath over a year-long span resulting in over 4200 pages of transcripts, hundreds of pages of notes, and volumes of documents. (Manitowoc Police Dept. Investigation Report "Inv. Report", ECF No. 35-49.) The investigators conducted three sworn interviews with Swetlik in particular. (Wirth Aff./3-21-11 Fulton Dep., ECF No. 35-14 at 59.) At the conclusion of their 73-page written report issued on August 22, 2007, the investigators recommended that Chief Kingsbury be removed from office for inefficiency, official misconduct or malfeasance in office. (Inv. Report, ECF No. 35-49, at 68.) The investigators also recommended, however, that Det. Swetlik be removed from the Department for repeatedly lying about the Chief. Specifically, the investigators noted:

> [T]here is no doubt that [Swetlik] lied to other officers about the Chief allegedly instructing him to lie to the sheriff's department deputies and threatening him for failing to do so. Perhaps more importantly, however, is that Detective Sergeant Swetlik allowed those lies to be perpetuated and brought forth to the Police and Fire Commission, the Common Council and this investigation in an effort to seek the removal of Chief Kingsbury. It was only after he learned that the entire conversation was recorded and he obtained a copy through the open records process, that he was forced to retract a part of the allegations. Nonetheless, Swetlik still clung to the allegation that the Chief instructed him to lie to the Sheriff's deputies despite clear and convincing evidence to the contrary contained in the recording.

(*Id.* at 70–72.) Based upon their findings, the investigators recommended that the City file charges with the PFC against Swetlik seeking his removal from the department under Wis. Stat. § 62.13(5).

On September 10, 2007, the Common Council Committee of the Whole, Mayor Crawford, and the investigators met. There was a vote on whether charges would be issued as recommended in the report. (Wirth Aff./Partial 11-17-11 Fulton Dep., ECF No. 35-16 at 233.) The Committee as a Whole voted unanimously to recommend formal charges be filed against Chief Kingsbury, Detective Swetlik, and one other police officer (Lieutenant Karl Puestow). (Wirth Aff./Pt. 3-21-11

Fulton Dep., ECF No. 35-14 at 152–53.) On September 11, 2007, the City Attorney issued a letter to Swetlik containing a Notification of Formal Charges with the PFC, informing him that the City would be seeking his removal by filing formal charges with the PFC. Swetlik was put on administrative leave pending the outcome of his charges but continued to receive his salary. (Wirth Aff./Swetlik Dep., ECF No. 35-1 at 25–26.)

On February 27 and 28, 2008, a termination hearing took place before a special hearing examiner, John F. Fuchs, who was appointed by the PFC. (Wirth Aff./Partial PFC 2/27-28/08 Transcript Term. Hrg., ECF No. 35-64.) Upon conclusion of the case, Swetlik moved to dismiss the charges. After considering Swetlik's motion, Fuchs recommended dismissal of the charges against Swetlik before the PFC. (Wirth Aff./Partial PFC 2/28/08 Trans., ECF No. 35-59 at 13–27.) Fuchs determined that the City did not meet the required burden of proof to demonstrate that Det. Swetlik lied when he stated that Chief Kingsbury instructed him to lie to another law enforcement agency and threatened him when he did not do so. Specifically, Fuchs concluded that Kingsbury's statement to Det. Swetlik could be taken as directing Swetlik to tell the jailers that Manitowoc police had additional questions to ask the suspect when they did not, and that the tone of Chief Kingsbury's voice could have been perceived by Swetlik as threatening, given the history between the two. (Wirth Aff./PFC Findings of Fact, ECF No. 35-60, at 6-10.) Based on his analysis of the evidence, Fuchs recommended that the PFC drop its charges against Swetlik (which it did). Swetlik was reinstated with the Manitowoc Police Department. (Wirth Aff./Swetlic Dep., ECF No. 35-1 at 77–78.)

Claiming damage to his reputation, extreme mental distress, and other losses as a result of the charges brought by the City, Swetlik filed suit against the Mayor and Common Council

7

members who signed the Statement of Charges, alleging they violated his First Amendment rights because they sought to terminate him for what he claims was protected speech. Specifically, Swetlik claims that his complaints against Chief Kingsbury were made while he participated in union activities and were therefore protected speech. Swetlik contends the charges were thus brought against him in retaliation for his union activities.

**II. Analysis**

Under the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**A. First Amendment**

Swetlik claims the defendants violated his First Amendment rights when they sought his termination for repeatedly accusing Chief Kingsbury of directing him to lie to County Sheriff officers during their November 12, 2005 phone conversation. (Compl. ¶¶ 38–43.) As established in *Connick v. Myers*, 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), "government employees do not lose their rights under the First Amendment to free speech and to petition the government for redress of grievances when they accept public employment." *See also Pickering*

8

*v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Miller v. Jones*, 444 F.3d 929, 941 (7th Cir. 2006); *Gray v. Lacke*, 885 F.2d 399, 410 (7th Cir. 1989). Thus, a governmental employer may violate an employee's rights under the First Amendment when it takes adverse action against such employee for speaking out on a matter of public concern. *Connick*, 461 U.S. at 147.

In *McGreal v. Ostrov*, 368 F.3d 657, 672 (7th Cir. 2004), the Seventh Circuit set forth a four-step analysis to determine whether a public employee's right to freedom of speech had been unlawfully abridged by a government employer. *See also Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002); *Gray*, 885 F.2d at 412. The first two elements place the burden of proof on the Plaintiff. Thus, to survive summary judgment, the Plaintiff need only demonstrate a genuine issue of material fact, *Myers*, 226 F.3d at 825, (1) that his speech or petition pertained to a matter of public concern, and (2) his speech or petition was a substantial or motivating factor in causing his employer to take an adverse employment action against him. *See McGreal*, 368 F.3d at 672; *Gustafson*, 290 F.3d at 906; *Miller*, 444 F.3d at 941–42.

If the employee can establish these two elements, then the employee's claims must survive summary judgment unless the employer can prove two elements in rebuttal. The employer must show beyond question that (1) its interest in efficiently providing public services outweighs the employees interests in freedom of speech and petition, and, therefore, its actions against the employee based upon the employee's speech were justified (known as " Pickering balance test"); or (2) the employer must prove that it would have taken the same action against the employee regardless of the employee's exercise of his rights to free speech. *See, e.g.*, *McGreal*, 368 F.3d at

9

672; *Mount Healthy City District Board of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gustafson*, 290 F.3d at 906; *Miller*, 444 F.3d at 942.

It is also important to note, however, that Swetlik's status as a government employee does not afford him greater First Amendment protection than a non-government employee has. It is only when he is speaking as a citizen on matters of public concern that the First Amendment protection claimed here is available. As the Court explained in *Garcetti v. Ceballos*,

> [A] contrary rule . . . would commit state and federal courts to a new, permanent, and intrusive role, mandating judicial oversight of communications between and among government employees and their superiors in the course of official business. This displacement of managerial discretion by judicial supervision finds no support in our precedents. When an employee speaks as a citizen addressing a matter of public concern, the First Amendment requires a delicate balancing of the competing interests surrounding the speech and its consequences. When, however, the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny. To hold otherwise would be to demand permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers.

547 U.S. 410, 423, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006).

Applying those principles to this case, to survive summary judgment, Swetlik first must show that he was speaking as a citizen and not simply performing his job duties. Assuming he was speaking as a citizen, he must then show that there is a genuine question as to whether his speech was a matter of public concern and whether the defendants responded adversely to Swetlik as a result of his speech. *See Celotex*, 477 U.S. at 322–324. In order to counter, the defendants must show that there is no question that either their actions outweighed Swetlik's interest in free speech or that they would have terminated Swetlik regardless of his speech.

Whether speech is made pursuant to official duties is a "practical" inquiry and should focus on "the duties an employee actually is expected to perform." *Garcetti*, 547 U.S. at 424–25. The

10

controlling factor is whether the speech "owes its existence to a public employee's professional responsibilities." *Id.* at 421. Swetlik contends he was not speaking within his official duties as a police officer but rather was speaking "as a citizen on a matter of public concern." (Pl.'s Brief in Opp'n., ECF No. 39 at 4.) Specifically, Swetlik contends none of his "speech" was prepared in the course of his official duties; rather it was prepared at the Union's request based on his information. (Pl.'s Prop. Finding of Fact "PPFOF", ECF No. 40 ¶¶ 20–26.) Swetlik further argues that because there was no investigation into his complaints about Chief Kingsbury to Deputy Chief Dick or to other sheriff or police department personnel, the defendants cannot claim that he was disciplined for his speech made pursuant to his official duties. Swetlik argues that this, coupled with his claim that the investigation stemmed from the Union's written complaints, supported by the Union's written documentation that did not reference Swetlik's verbal complaints, necessitates a finding that Swetlik did not complain about Chief Kingsbury in the course of his official duties.

The defendants, on the other hand, argue that Swetlik's accusations against Chief Kingsbury were not protected because at the time he made those allegations he was speaking pursuant to his official duties. Swetlik's initial reporting of the Chief's alleged misconduct, the defendants argue, was performed in the course of his duties as a member of the Department. Rule 102.06 of the Police Department's policies states:

> 13. Any member of the Department feeling aggrieved at the treatment or orders of a superior officer, or any member wishing to call attention to any matter of police business or neglect of duty, or to make a suggestion for the improvement of the Department, shall communicate in writing with the Chief of Police.
>
> 14. It is the duty of every person connected with the Police Department to note and report to the Chief any and all violations of the Policies and Rules and Regulations and Procedures, which may come under his notice. Failure to do so will subject the offender to punishment.

11

(DPFOF, ECF No.36, ¶ 24.) Swetlik thus followed this rule when he repeated these allegations to fellow officers, to higher-ups within the Department (including the Deputy Chief), to Chief Kingsbury himself, and also brought them before the City's Common Council and PFC as part of a larger list of Manitowoc police officer complaints against Chief Kingsbury.

The fact that his accusations were not initially investigated by the Department, defendants argue, is irrelevant to the question of whether the statements were made in the course of his duties. The focus is on the role of the employee who made the statements, not the response of those to whom they were made. Moreover, Swetlik's accusations were investigated, initially after he personally complained to the Chief, and later on when the Union presented its list of "concerns." Both investigations were conducted at the direction of the City Attorney by independent law firms. When interviewed during the course of the second investigation by the Dewitt law firm, Swetlik was placed under oath and gave sworn testimony. He was clearly acting in his capacity as a Detective Sergeant with the Manitowoc Police Department.

The defendants cite several cases which seem to support their argument that even when an employee is reporting serious misconduct by his superiors, his speech is not constitutionally protected if he is required to report such conduct as part of his official duties. In *Spiegla v. Hull*, for example, a correctional officer filed a § 1983 suit when she was transferred to a less desirable position after she reported possible misconduct to her superior and sought clarification of a security policy she felt may have been breached. 481 F.3d 961, 963 (7th Cir. 2007). Finding *Garcetti*, which was decided after she prevailed at trial, dispositive, the Seventh Circuit vacated the judgment in favor of the plaintiff and remanded the case for dismissal. "That Spiegla's statements highlighted potential misconduct by prison officers does not change the fact that she was speaking

pursuant to her official responsibilities, not as a citizen 'contributi[ng] to the civic discourse.'" *Id.* at 967 (quoting *Garcetti*, 547 U.S. at 421).

Likewise, in *Callahan v. Fermon*, the Court reversed a judgment in favor of an Illinois State Police lieutenant who claimed that he was transferred to another division in retaliation for his statement at a department meeting that he did not believe two men serving sentence for a murder were guilty and for filing complaints over the handling of the investigation. 526 F.3d 1040 (7th Cir. 2008). The plaintiff claimed that the captain assigned the investigation had ignored evidence suggesting a person with connections to organized crime had in fact committed the murder and that another supervisor had ordered the plaintiff not to pursue the investigation himself because it was too politically sensitive. Applying *Garcetti*, the Court concluded that both on both occasions, the plaintiff was speaking pursuant to his official duties. His statements at the department meeting were pursuant to his official duties because he was ordered to attend the meeting and report the results of his investigation. And the complaints he filed were pursuant to his official duties because the department rules of conduct require all state police officers to report misconduct of fellow employees to the department of internal investigations. "That requirement was part of his official responsibility as a police lieutenant." *Id.* at 1045. Because the statements for which he claimed he suffered retaliation were made pursuant to his official duties, they were not protected and the judgment in his favor was reversed. *See also Sigsworth v. City of Aurora*, 487 F.3d 506, 511 (7th Cir. 2007) (holding that police officer's report to supervisors of suspicion that suspects were warned of impending raid by members of drug task force to which he was assigned was within scope of duties as police officer and task force member and thus not entitled to First Amendment

13

protection); *Voss v. Kliment*, 506 F.3d 565 (7th Cir. 2007) (holding that police officer's reports to his supervisors about suspected misconduct by other officers were not protected speech).

Swetlik argues that *Garcetti* and the foregoing cases do not control here, however, because in this case he provided information about misconduct by the Chief as a Union steward that was published to elected officials and members of the public. Having publicly spoken of the misconduct as part of the Union's request to the City Council that Chief Kingsbury be removed, Swetlik argues his accusations fall outside of *Garcetti*'s limitation on public employee First Amendment claims. In support of his argument that *Garcetti* does not apply, Swetlik cites *Fuerst v. Clarke*, a case in which a sheriff's deputy, who was also president of the union, criticized the Sheriff's decision to hire a public-relations officer. 454 F.3d 770,774 (7th Cir. 2006). Those comments were reported in a newspaper and the deputy claimed that the Sheriff failed to promote him because of those comments. *Id.* at 772. The Seventh Circuit concluded that because the deputy's comments that precipitated the adverse action taken against him were made in his capacity as a union representative, rather than in the course of his employment as a deputy sheriff, *Garcetti* is inapposite. *See also Nagle v. Village of Calumet Park*, 554 F.3d 1106 (7th Cir. 2009) ("Nagle was speaking in his capacity as a union representative and *Garcetti* does not deprive his comments of First Amendment protection.").

Of course, here, Swetlik's accusations concerning Chief Kingsbury were not limited to the Union's public filing. He accused Chief Kingsbury of instructing him to lie to another agency and threatening him for his refusal to do so both before the Union published its list of concerns and afterwards during the course of his multiple interviews during the investigation. In fact, Swetlik was not even identified as the source of the accusation in the Union's list of charges against the

14

Chief. Thus, it is questionable whether *Fuerst* helps him. In *Morales v. Jones*, the Court concluded that speech made to one individual in one context may be protected under the First Amendment while precisely the same speech to another individual is not protected. 494 F.3d 590, 598 (7th Cir. 2007). There, the Court remanded the case for a new trial on the issue of whether the retaliatory action was taken in response to the protected speech or the unprotected speech.

Here, it is unnecessary to decide which of Swetlik's multiple accusations motivated the defendants' vote to file charges against him. Even assuming, *arguendo*, that Swetlik's statements were made as a citizen and not pursuant to his official duties, they are still not entitled to First Amendment protection unless they relate to a matter of public concern. Swetlik contends that his accusations clearly implicate a matter of public concern because he was accusing the Chief of misconduct. More specifically, Swetlik accused the Chief of directing him to lie to another law enforcement agency and threatening him for failing to do so. In fact, however, Swetlik's accusations concern the Chief's failed effort to get a distraught stabbing suspect a home-cooked meal, hardly a matter of public concern. It is the underlying reality, not the employee's pejorative characterization of it, that controls. This wasn't a case of the Chief trying to bust a friend's kid out of jail, taking a bribe, or ordering his political enemies arrested. Chief Kingsbury was simply trying to delay the booking process to try to get a meal to a suspect who had apparently indicated a refusal to eat. Swetlik cannot transform a minor internal matter into an issue of grave public concern by exaggerating what the Chief said and ignoring the context in which he said it.

Swetlik's claim also fails because the defendants' actions were nevertheless justified even if he did not intentionally lie. For the law is clear that even if a public employee's statements are presented in a manner and context so that they addressed a matter of public concern, they still do

15

not guarantee First Amendment protection if the "relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. Under the *Pickering* analysis, it is well established that "[d]eference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law enforcement." *Kokkinis v. Ivkovich*, 185 F.3d 849, 845 (7th Cir. 1999). Likewise, a police officer who exaggerates (and possibly falsifies) information about the police chief's on-duty behavior is detrimental to the workings of the police department. Therefore, even if Swetlik's speech was somehow protected, the police department in this case has a more important interest in ensuring its officers are truthful and prudent in reporting criminal wrongdoing or misconduct.

Finally, it is important to note that the action taken by the defendants against Swetlik (i.e., requiring that he answer charges that he had lied in his accusations about the Chief) came at the recommendation of an independent, in-depth investigatory report. Swetlik suggests that, in fact, the investigation was somehow influenced by Chief Kingsbury's attorney who had as his purpose "painting the Chief's side of the story to those investigators" (Pl.'s Br. in Opp'n, ECF No. 39 at 2), but he offers no evidence to support such an assertion. Plaintiff's theory seems utterly implausible since the same investigators who recommended that Swetlik be terminated for dishonesty also recommended that the Chief be removed for inefficiency, official misconduct or malfeasance in office, and that Lieutenant Puestow, who gave testimony favorable to the Chief, also be terminated for dishonesty. Even aside from the investigator's report, the transcript of the telephone call itself provided more than an adequate basis on which to conclude that charges were justified. In light of the evidence presented to them, it is clear that the defendants are immune from

16

personal liability under the doctrine of qualified immunity. *See Davis v. Zirkelbach*, 149 F.3d 614, 619–21 (7th Cir. 1998) (police officers who relied on specific advice of attorney were entitled to qualified immunity when the advice was unequivocal and closely tailored to the particular facts, the attorney was the one responsible for rendering such advice, and the police acted promptly upon receiving the advice). Indeed, given the nature of their role in the matter, the defendants may even be entitled to the absolute immunity normally afforded prosecutors entrusted with making charging decisions under *Imbler v. Pachtman*, 424 U.S. 409 (1976). *See Mylett v. Mullican*, 992 F.2d 1347, 1353 (5th Cir. 1993) (holding that members of municipal civil service commission were entitled to absolute immunity in connection with their decision to uphold termination of police officer).

**III. Conclusion**

In sum, there is thus no genuine issue of material fact here. Given the context of his speech and the underlying incident, Swetlik was not speaking on a matter of public concern. The Defendants did not seek to discipline Swetlik because he was making statements as a Union member or as a citizen on a matter of public concern but rather because he misrepresented the Kingsbury incident to members of the Department and to investigators under oath, even after he had listened to a recording of the conversation. (DPFOF, ECF No. 36, ¶¶ 74, 76, 85–86, 102, 103.) And even assuming, *arguendo*, that Swetlik was somehow speaking in a context so as to turn the issue into a matter of public concern, the Defendants' interests in efficiency and honesty in law enforcement outweigh any possible First Amendment issue here. Finally, the defendants have at least good faith immunity from any potential liability arising out of their vote to issue charges against Swetlik pursuant to the recommendation of the attorneys they retained to investigate the

17

charges against the Chief. I therefore find for the defendants and conclude they are entitled to summary judgment. The Clerk is directed to enter judgment in favor of the defendants and against the plaintiff dismissing all claims.

**SO ORDERED** this   26th   day of June, 2012.

 s/ William C. Griesbach
William C. Griesbach
United States District Judge